UNITED STATES DISTRICT COURT     SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Richard Winfrey, Junior, *et al.*, | § | <br>United States District Court<br>Southern District of Texas<br>**ENTERED**<br>October 04, 2016<br>David J. Bradley, Clerk |
| Plaintiffs, | § | |
| | § | |
| | § | |
| *versus* | § | Civil Action H-10-1896 |
| | § | H-14-448 |
| | § | |
| Keith Pikett, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## Opinion on Partial Summary Judgment

1.    *Introduction.*

A father, his son, and his daughter were searched, arrested, and tried for murder. All three were, eventually, acquitted. The son and daughter sue the investigators and the counties that employ them for violating their constitutional rights. The son will take nothing. The daughter will take nothing on all but one of her claims.

2.    *Background.*

In August of 2004, Murray Wayne Burr was found dead in his home in Texas's San Jacinto County. Blood spatter showed that the murder started in his living room, and the body was dragged to the bedroom. The County Sheriff Lacy Rogers and Deputy Sheriff Lenard Johnson led the investigation. Texas Rangers Grover Huff and Ronald Duff assisted.

Ultimately, the investigators concluded that Richard Winfrey, Senior, and his children Richard Winfrey, Junior, and Megan Winfrey killed Burr.

A.    *The Investigation Begins.*

Burr had worked as a janitor at Coldspring High School where Megan and Junior were students. Some of the initial evidence indicated that they had socialized.

Burr's neighbors said that Megan and Junior asked Burr to let them move in with him, but he said no. One teacher at the school saw Megan put her arm in Burr's and ask if he was going to take her out and spend some of the money he had hidden in his house on her.

A second teacher said she saw a verbal fight between Megan and Burr after which Megan muttered, "Someone should beat the shit out of him." A third teacher told of a time Megan acted violently towards her.

### B.     *Scent Evidence Gathered.*

Keith Pikett – a deputy from a nearby agency – assisted the investigation by running scent-pad line-ups. The line-up uses bloodhounds to compare a suspect's scent to the scents found on a victim's clothes. On August 24, 2004, Pikett ran the line-up using bloodhounds and scents from four suspects – Megan, Junior, Chris Hammond, and Adam Szarf. The bloodhounds alerted only on Megan's and Junior's scents.

The bloodhounds also traced a scent by following a scent trail, a method often used to find lost people or fleeing criminals. The investigators gave the hounds the scent at Burr's house. The hounds located the scent and followed it to the Winfrey house. The officers thought the scent used was Junior's; the scent actually came from Chris Hammond, Megan's boyfriend.

### C.     *Blood not a match.*

In September of 2004, the investigators received a report from the Houston Crime Laboratory. A lot of blood was found at Burr's house. The report compared the DNA of the blood found in Burr's house with the suspects' DNA. The report concluded that neither Megan's nor Junior's blood was at the scene. The report also concluded that all of the blood may have come from Burr but it could not conclude his blood was the only blood at the scene.

### D.     *Megan's hair not a match.*

The investigators found hairs on and near Burr's body that did not belong to Burr. In January of 2005, Rogers signed an affidavit and received a search warrant for Megan's hair.

In the affidavit, he included (a) the neighbor's statement that Megan socialized with Burr; (b) the teacher's statements; (c) the results of the line-up; (d) the partially erroneous results of the scent trail. He did not include that the blood at the scene may have come from someone other than Burr, Megan, or Junior. Megan's hair was not a match.

E.    *An Informant Comes Forward.*

The investigation stalled for over a year. Until then, Senior had not been a suspect. David Campbell changed that.

Some time after Burr's murder, Senior was imprisoned on an unrelated matter. he was housed with Campbell. Campbell told a warden that he confessed his involvement in a murder in San Jacinto County. The warden contacted Johnson.

Johnson met with Campbell and wrote a summary of his statement. According to the report, Senior told Campbell that he committed a murder in San Jacinto County in 2005. Senior also told Campbell that: (a) Megan and Junior played across the street from Burr's house; (b) one of Burr's neighbors told Senior that Burr had touched one of Senior's children; (c) Megan and Junior helped Senior get into Burr's house; (d) Senior severely beat Burr and cut his neck; (e) Senior cut off Burr's genitals and placed them in Burr's mouth; and (f) Megan and Junior were present the whole time. Johnson told Campbell that he would return with Rogers for more information.

Rogers and Johnson returned to question him. They videotaped the interview. Campbell elaborated on what he originally told Johnson. This time, Campbell added that (a) a cousin entered with Senior; (b) Burr was in the living room; (c) Burr was shot as well as stabbed; (d) Senior stole two guns (a pistol and a .3030 rifle) from Burr; and (e) Senior hid the guns and a knife in a hollow on Winfrey property. Those facts are missing from Johnson's report about the first interview.

After the interview, Johnson learned from one of Burr's relatives that two guns were missing from Burr's house after the murder. The relative said the missing guns were a shotgun and a .22 rifle, not a pistol and a .3030 rifle.

The investigators also found a hollow matching Campbell's description of where Senior hid the guns and knife but did not find any weapons in the hollow.

Finally, Pikett ran a line-up using Senior's scent. Senior's scent matched the scent on Burr's clothes.

F.    *Junior's and Senior's hair not a match.*

On August 23, 2006, Johnson signed two affidavits to obtain search warrants for Junior's and Senior's hair. He wanted to compare their hairs against the hair found at the scene.

Both affidavits omitted some of the evidence favorable to Junior and Senior. Johnson excluded: (a) the inconsistencies between Campbell's two interviews; (b) the inconsistencies between Campbell's statements and the other evidence; (c) that Junior's blood and Megan's blood was not found at the scene; and (d) that the hair found at the scene did not match Burr or Megan.

Junior's and Senior's hairs did not match the hair found at the crime scene.

G.      *Winfreys Arrested and Eventually Acquitted.*

On February 2, 2007, Johnson signed affidavits for arrest warrants for Megan, Junior, and Senior. The substance of Johnson's affidavits for the arrest warrants is identical to Johnson's affidavits for Junior's and Senior's search warrants.

Johnson's arrest affidavits contained the same errors as the search affidavits. There was an additional omission: the hairs recovered at the crime scene did not belong to Junior, Megan, Senior, or Burr.

In October of 2008, Megan was convicted. On June 12, 2009, Junior was acquitted. On February 27, 2013, Megan's conviction was overturned.

H.      *Allegations that Campbell's Interview was Staged.*

Campbell testified at Megan's trial. He was asked about letters he sent Senior's sister, Vicki Haynes. While in prison, Campbell received a letter from Haynes. She had learned that he was going to be a witness. Campbell was worried because Haynes knew where his family lived; he feared retribution. Campbell wrote back saying that the first interview, by Johnson, was "staged." At trial, Campbell reaffirmed this and said that Johnson tried to make something up. As a result, Campbell asked to speak to someone with more authority – Rogers.

Campbell never explains what Johnson tried to add or in what way the interview was "staged." Johnson's summary of the interview is consistent with the content of both the second interview and Campbell's testimony at trial. The video shows that Campbell was not under duress or coached during the second interview.

3.     *Case History.*

Senior, Megan, and Junior sued every investigator; most of the claims have been resolved.

In Junior's case, the court granted summary judgment to the defendants. The United States Court of Appeals reversed the judgments for Johnson, Rogers, and Pikett. Pikett was dismissed by agreement of the parties.

Junior's claims against Rogers and Johnson pend. Megan's claims against Rogers, Johnson, Pikett, and San Jacinto County pend.

Junior will take nothing. Megan will take nothing from Rogers, Johnson, and the County. Megan's claims against Pikett survive.

4.     *Mandate.*

The court of appeals held that on the facts then discovered, (a) Junior's claims against Pikett for fabrication of evidence could not be denied as a matter of law; and (b) Junior had made a *threshold* showing of objective unreasonableness in the preparation of the search and arrest warrant.

Megan and Junior attempt to use the court of appeals's decision. The court conducted further discover; the record has changed. The determination of whether Megan's and Junior's claims can be decided as a matter of law will be based on the facts now in evidence.

5.     *Limitations.*

Megan and Junior sue Johnson and Rogers for searching and imprisoning them without due process and fabricating Campbell's testimony. Megan also sues Pikett for manufacturing the scent-pad line-ups. These are claims for damages for violations of constitutional rights.

Federal law authorizes some actions that stem from violations of constitutional rights. State law determines how long a person may wait before suing.[1] Under Texas law, a person must sue within two years of a violation. Accrual is determined by federal law.[2] The limitations period begins when the injury is complete, the plaintiff knows it, and knows it's cause.

A.    *Illegal Searches.*

Megan and Junior seek damages for unreasonable searches – the subpoenas for their hair. The limitations period began when the search was complete because the Winfreys knew who searched them.

They say that the limitations period did not begin until they were acquitted because challenging the searches meant challenging their convictions. A claim for damages based on an illegal search does not imply unlawful imprisonment.[3] Here, for example, the searches did not produce evidence against Megan or Junior. Therefore the searches did not produce evidence that supported their imprisonment.

Megan was searched in 2005; her claim expired in 2007. She did not sue until May 26, 2014. Her claims for unreasonable search are untimely.

Junior was searched in 2006; his claim expired in 2008. He did not sue until May 26, 2010. His claims for unreasonable search are untimely.

B.    *Illegal Arrests and Manufacture of Evidence.*

Civil claims that challenge imprisonment can be brought only once the accused has been acquitted.[4] Concerns for finality and consistency cannot abide the use of civil suits to attack convictions collaterally.

---

[1] Owens v. Okure, 488 U.S. 235, 239 (1989).

[2] Wallace v. Kato, 549 U.S. 384, 388 (2007).

[3] Heck v. Humphrey, 512 U.S. 477, 487 n.7 (1994).

[4] Id. at 486-87.

Megan and Junior say that their arrests were not supported by probable cause and that the evidence used against them was manufactured. The defendants say that the limitations period began once Megan and Junior were held pursuant to legal process.

The Winfrey's claims are not for detention without legal process;[5] rather, they are for wrongful institution of legal process. Claims about probable cause and guilt cannot be brought until the accused is acquitted.[6]

On June 12, 2009, a jury acquitted Junior. Less than a year later, he sued. He brought his claims for arrest without probable cause and the manufacture of evidence within the limitations period.

On February 27, 2013, the Texas Court of Criminal Appeals reversed Megan's conviction. Less than a year later, she sued. She brought her claims for arrest without probable cause and the manufacture of evidence within the limitations period.

7.      *Megan and Rogers.*

Megan seeks damages from Rogers because he (a) wrote a misleading affidavit for a search warrant and (b) coerced Campbell's testimony. Though her claim for the search must be dismissed as brought after the limitations period, the court still considers its merits.

A.      *Misleading Affidavit to Search.*

To recover, Megan must show that Rogers (a) violated her rights and (b) was not protected by qualified immunity.

The law requires that Rogers's affidavit include enough facts to enable the magistrate to make an independent evaluation that there was probable cause to search Megan.[7] Rogers violated Megan's Fourth Amendment rights if he recklessly included false information or excluded important information from his affidavit.

---

[5] Wallace, 549 U.S. at 389.

[6] Id. at 484.

[7] Franks v. Delaware, 438 U.S. 154, 165 (1978).

Even if Rogers violated Megan's rights, he is protected by qualified immunity if the search was objectively reasonable.[8] Rogers's search was objectively reasonable if supported by probable cause.[9] Thus, Megan must show (a) Rogers's recklessness in writing a misleading affidavit and (b) that a reasonable magistrate, reviewing a corrected affidavit, would not have found probable cause.

A reasonable magistrate would find probable cause in a corrected affidavit if it contained enough facts to justify a belief that Megan murdered Burr. The belief must be more than a suspicion but far less than a preponderance of the evidence. Though a corrected affidavit must include favorable evidence, once a reasonably credible source comes forward, the investigators do not have an obligation to investigate further.[10]

The court now examines Megan's evidence that her rights were violated and compares Rogers's affidavit with a corrected affidavit to determine whether a reasonable magistrate could have found probable cause.

(1)    *Claimed Rights Violations.*

Megan says that Rogers violated her Fourth Amendment rights by recklessly (a) including the evidence from the scent-pad line-up, (b) including the partially erroneous scent trail, and (c) excluding the favorable DNA evidence.

(a).    *Inclusion of Line-Up.*

Megan says that Rogers recklessly included the results of Pikett's line-up in his affidavit.

---

[8] Malley v. Briggs, 475 U.S. 335, 344-45 (1986).

[9] See U.S. v. Leon, 468 U.S. 897, 922-23 (1984); U.S. v. Perez, 484 F.3d 735, 743 (5th Cir. 2007).

[10] Woods v. City of Chi., 234 F.3d 979, 997 (7th Cir. 2000).

Even if Pikett's line-up is junk science that has no place in criminal investigations, Rogers did not know that when he signed the affidavit. Pikett was a police officer with a nearby agency. He worked with the Federal Bureau of Investigations. At least one Texas court had found testimony by Pikett about the results of a line-up admissible.[11] No fact suggests that Rogers erred in including Pikett's results.

(b). *Misidentification of the Scent Used on the Scent Trail.*

Huff intended to run the scent trail from Burr's house with Junior's scent; he accidentally used Chris Hammond's. Assuming that Huff told Rogers when he discovered the error, Rogers's false statement that Junior's scent was used was reckless but not important. Both Hammond and Junior are affiliated with Megan. Junior is her brother; Hammond was her boyfriend. Had the error been remedied, the value of the evidence would not have changed.

Rogers's error about whose scent was used was reckless but not important.

(c). *Exclusion of Favorable DNA Evidence.*

Rogers recklessly excluded that Megan did not contribute to the blood in Burr's house. Rogers knew this information; the Lab sent him the report.

That Megan's blood did not match the blood at the scene was of some importance. Burr's murder was violent. The killer could have been cut and bled during the struggle. If Megan killed Burr and the killer bled during the murder, Megan's blood would have matched the blood at the scene. The DNA evidence decreases the likelihood that Megan killed Burr. Rogers recklessly excluded this evidence, violating Megan's Fourth Amendment rights.

---

[11] Winston v. State, 78 S.W. 3d 522, 529 (Tex.App.–Houston [14th Dist.] 2002, pet. ref'd).

(2).   *Rogers not Protected by Qualified Immunity.*

Rogers was not protected by qualified immunity because there was not probable cause to search Megan. The investigators had evidence that (a) Megan and Junior wanted to move in with Burr, but he said no; (b) Megan was flirtatious but also fought with Burr; (c) she thought he had money in his house; (d) she was violent towards other school employees;[12] (e) her scent was on his clothes;[13] and (f) her boyfriend traveled from Burr's house to her house.

This evidence supported a reasonable belief that there was a relationship between Megan and Burr and that she was at his house sometime before the murder. There was no evidence linking her to the murder. A trier of fact could conclude that a reasonable magistrate reviewing a corrected affidavit could not have found probable cause to search Megan.

Megan raises a fact issue about whether Rogers was protected by qualified immunity, but her claim is barred by limitations. Megan will take nothing from Rogers on this claim.

B.   *Coercion of Campbell.*

Megan says that Rogers and Johnson coerced Campbell to give false information. There are no facts to support a claim that Rogers forced Campbell to incriminate Megan. The data in Johnson's report of the first interview, the video of the second interview, and Campbell's testimony at trial is consistent. Campbell was not under duress at trial.

Megan will take nothing from Rogers on her claim that he manufactured evidence against her.

8.   *Megan and San Jacinto County.*

Megan could recover damages from San Jacinto County for the unconstitutional acts of its final policy maker, Rogers.

---

[12] Propensity evidence may be used in probable cause determinations. Federal Rules of Evidence 1001(d)(3).

[13] The court evaluates probable cause at the time of the search and does not consider later evidence questioning the validity of Pikett's methods.

Megan's claim against Rogers for writing a flawed affidavit to search her is barred by limitations. Her claim against Rogers for coercing Campbell to give a false statement is not supported by the facts.

Because Megan takes nothing from Rogers, she will take nothing from the county.

9.    *Junior and Rogers.*

Junior seeks damages from Rogers for (a) writing a misleading affidavit and (b) coercing Campbell's testimony.

Rogers did not write the affidavits used to secure warrants for Junior's search and arrest. Junior will take nothing from Rogers on this claim.

There are no facts to support Junior's claim that Campbell's testimony was coerced. Junior will take nothing from Rogers on this claim.

10.    *Junior and Johnson.*

Junior seeks damages from Johnson because he (a) wrote misleading affidavits to secure warrants and (b) coerced Campbell's testimony. Though his claim for the search must be dismissed as brought after the limitations period, the court still considers its merits.

A.    *Misleading Affidavit to Search.*

To recover, Junior must show that Johnson (a) violated his rights and (b) was not protected by qualified immunity.

Johnson violated Junior's Fourth Amendment rights if he recklessly included false information or excluded important information from his affidavit. Even if Johnson violated Junior's rights, he is protected by qualified immunity if the search was supported by probable cause. Thus, Junior must show (a) Johnson's recklessness in writing a misleading affidavit and (b) that a reasonable magistrate, reviewing a corrected affidavit could not have found probable cause. A reasonable magistrate could find probable cause in a corrected affidavit if it contained enough facts to justify a belief that Junior murdered Burr.

The court now examines Junior's evidence that his rights were violated and compares Johnson's affidavit with a corrected affidavit .[14]

---

[14] An appendix compares the actual affidavit with a corrected affidavit.

(1). *Claimed Rights Violations.*

Junior says that Johnson violated his Fourth Amendment rights by recklessly excluding (a) the fact that Campbell made two inconsistent statements; (b) the parts of Campbell's statement contradicted by other evidence; and (c) the DNA and hair evidence.

(a).     *Exclusion of Inconsistent Statements Not Reckless.*

Junior says that: (a) Campbell's two statements were inconsistent, and (b) Johnson's omission of the inconsistencies from the affidavit was reckless.

The evidence does not show that the statements were inconsistent. Assuming the inconsistencies, Johnson's exclusion of them was not reckless because they are not grave enough to discount Campbell's statements.

Campbell's statements are not clearly inconsistent. The first interview was not formal. Johnson's notes were not meant to be a complete record of Campbell's statement. The notes were part of a live report that was supplemented later. Johnson told Campbell at the end of their first meeting that he would return with Rogers to take a full statement. It is likely that Campbell either told a more complete story the second time or Johnson's notes from the first time were incomplete.

Even if Campbell intended to tell a full story both times and added information the second time, Johnson's exclusion of that fact in the affidavit was not reckless. It merely evinces that Johnson either did not (a) see any inconsistencies between Campbell's two statements or (b) attach any importance to them. A jury cannot reasonably find that he should have. Johnson did not violate Junior's rights by excluding the inconsistencies.

(b).     *Reckless Exclusion of Parts of Campbell's Statement.*

Junior says that (a) other evidence gathered by the investigators contradicted parts of Campbell's statement, and (b) Johnson recklessly omitted the inconsistent parts.

Johnson excluded portions of Campbell's statement that were contradicted by other evidence. Campbell said that Burr was beaten, cut, and shot. The autopsy report showed that Burr was beaten and cut but not shot. Campbell said Senior cut off Burr's genitals and put them in Burr's mouth. There was no evidence of genital mutilation.

Campbell also said that Senior stole a pistol and a .3030 rifle. While Burr's relatives confirmed that two guns were missing, they said the guns were a shotgun and a .22 rifle. Campbell said that Senior hid the guns and a knife in a hollow on Winfrey property. The investigators found a place matching Campbell's description but did not find guns or a knife.

Johnson had either direct knowledge of these inconsistencies or chose not to read the information in the file he used to write the affidavit.

These omissions were reckless. Inconsistencies between Campbell's statement and other evidence are a reason to doubt Campbell's credibility. While the court will conclude that these inconsistencies were not grave enough to discount Campbell's credibility, that decision was not for Johnson to make. He should have presented all of the important facts. Johnson violated Junior's Fourth Amendment rights.

(c).    *Reckless Exclusion of DNA and Hair Evidence.*

Johnson also omitted that the blood at the scene did not match Megan and Junior and that the hair did not match Megan.

Johnson had either direct knowledge of this evidence or chose not to read the information in the file he used to write the affidavit.

Omission of this evidence was reckless. The lack of blood from Megan and Junior at the crime scene decreased the likelihood that they killed Burr. While the court will conclude that the inclusion of this favorable evidence would not have been enough to overcome a reasonable belief that Junior and Megan were involved in the murder, that decision was not for Johnson to make. He should have presented all of the important facts. In not doing so, Johnson violated Junior's Fourth Amendment rights.

(2).    *Johnson Protected by Qualified Immunity.*

Johnson was protected by qualified immunity because a reasonable magistrate, reviewing a corrected affidavit, would have found probable cause to search Junior. Johnson had evidence of: (a) the relationship, possibly romantic, between Megan and Burr; (b) her desire for his hidden money, (c) the presence of Megan's, Junior's, and Senior's scents on Burr after his death, and (d) Campbell's statement that Senior murdered Burr with the help of Megan and Junior.

Campbell was a credible source. Though he included some details that did not match other evidence, the majority of the facts he gave matched the investigators' theory of the case. He also gave one fact – about the missing guns – that was unknown at the time.

Though the lack of DNA evidence decreases the likelihood that Megan, Junior, and Senior killed Burr, it is not enough to cast doubt on the investigators' reasonable belief of the Winfreys' guilt. The investigators believed that three or four people worked together to kill Burr and that he was murdered while in his living room with people he considered to be friends. They reasonably believed that the Winfreys killed him without suffering an injury in the process.

On the facts before it, the court can decide as a matter of law that a reasonable magistrate, reviewing a corrected affidavit, could have found probable cause to search Junior. Junior will take nothing from Johnson on this claim.

B.    *Misleading Affidavit to Arrest Junior.*

Junior says that Johnson recklessly wrote a misleading affidavit for his arrest and that the arrest was not supported by probable cause.

Johnson says that the court cannot consider this claim because the affidavit for Junior's arrest was destroyed at Junior's request. The four affidavits before the court are substantively identical. The content of Junior's arrest affidavit was the same as Megan's and Senior's.

Because the search affidavit violated Junior's rights, the arrest affidavit did as well. The affidavit supporting Junior's arrest contained the same errors as the search affidavit plus one additional error. The Lab reported that the hairs gathered from Junior and Senior did not match the hair found at Burr's house. That omission is unique because it shows that someone was present in Burr's house other than Burr, Junior, Megan, and Senior.

The additional fact that someone else left hair at Burr's house does not cast enough doubt on the incriminating evidence to overcome a reasonable belief that Junior participated in Burr's murder.

One the facts before it, the court can decide as a matter of law that a reasonable magistrate, reviewing a corrected affidavit, could have found probable cause to search Junior. Junior will take nothing from Johnson on this claim.

C.      *Coercion of Campbell.*

There are no facts to support Junior's claim that Campbell's testimony was coerced. Junior will take nothing from Johnson on this claim.

11.    *Megan and Johnson.*

Megan seeks damages from Johnson because he (a) wrote a misleading affidavit to secure a warrant for Megan's arrest, and (b) coerced Campbell's testimony.

A.      *Misleading Affidavit to Arrest Megan.*

Johnson's affidavit to arrest Megan contained the same errors as his affidavits to search and arrest Junior. Johnson violated Megan's Fourth Amendment rights by recklessly omitting that (a) parts of Campbell's statement were inconsistent with other evidence; and (b) DNA and hair evidence did not match any of the Winfreys.

Even if Johnson had corrected those errors, a reasonable magistrate would have found probable cause to arrest Megan. The evidence still indicated: (a) a relationship, possibly romantic, between Megan and Burr; (b) her desire for his hidden money; (c) the presence of Megan's, Junior's, and Senior's scents on Burr after his death; and (d) Campbell's statement that Senior murdered Burr with the help of Megan and Junior.

On the facts before it, the court can conclude as a matter of law that a reasonable magistrate reviewing a corrected affidavit could have found probable cause to arrest Megan. Megan will take nothing from Johnson on this claim.

B.      *Coercion of Campbell.*

There are no facts to support Megan's claim that Campbell's testimony was coerced. Megan will take nothing from Johnson on this claim.

12.    *Megan and Pikett.*

Pikett invented and ran the scent-pad line-up that identified Megan, Junior, and Senior as contributors to the scents on Burr's clothes. The investigators used the line-up to support probable cause to search and seize Megan. Pikett testified about the line-up at Megan's trial. Megan says that Pikett manufactured the results of the line-up.

A.    *Pikett's Background.*

Pikett bought a bloodhound as a pet and decided to train it. He attended seminars about how to use bloodhounds to track people. Based on what he learned, Pikett developed scent-pad line-ups as a tool to help police officers.

Pikett has a bachelor's degree in chemistry and a master's in sports coaching. He came up with scent-pad line-ups on his own. He did not receive training, read scientific literature, or publish peer-reviewed articles.

B.    *Performing the Line-Up.*

Before meeting the lead investigators, Pikett asked them to gather (a) scents from suspects and (b) scents from the victim. Texas Ranger Grover Huff gave a piece of gauze to each suspect, asked them to rub it on their skin, and had them place the gauze in a plastic bag. Huff also rubbed a piece of gauze on Burr's clothes and put the gauze in another plastic bag.

Pikett met the investigators in a field. Pikett brought his dogs, unused paint cans, and filler scents that he took from prisoners at the Fort Bend County Jail. Pikett stores the filler scents in a duffle bag that he keeps in the back of his SUV – the same place where his dogs ride daily.

Huff put either a suspect's scent or a filler scent in each paint can. Huff then put the paint cans in the field while Pikett prepared one of his dogs. Pikett then gave the dog the victim's scent.

Pikett walked the dog next to each can to see if the dog "alerted" on any of the cans. Each dog's alert varies. Pikett has been unable to train his dogs to alert in a specific manner. Instead, he learns each dog's individual alert as he works with it. If the dog alerts on a can, Pikett concludes that the scent in the can matches the scent from the victim's clothes.

After the first dog did the line-up, Pikett did the same line-up one or two additional dogs to confirm the initial result. The position of the cans was not altered for each dog.

Both of the dogs used alerted on Megan's scent and Junior's scent as a match to the scent on Burr's clothes. All three of the dogs used alerted on Senior's scent as a match.

C.      *Megan's Claims against Pikett.*

Megan sues Pikett for violating her constitutional rights by fabricating the results of the scent-pad line-up. Megan must show that Pikett (a) violated her rights and (b) was not protected by qualified immunity from damages.

If Pikett fabricated scientific evidence to help justify Megan's imprisonment, he violated her Fourteenth Amendment due process rights. His qualified immunity does not protect him from deliberately or recklessly creating a scientifically inaccurate report.[15] Pikett's behavior is measured against what a reasonable police officer with his training and experience should have known about the reliability of his report.

D.      *Nicely Report.*

In evaluating Megan's claim, the court considers the technician's report submitted by Megan. Pikett objects because Steven Nicely has no experience with scent-pad line-ups or training bloodhounds. Nicely has extensive experience with scent detecting dogs. No technician has experience with scent-pad line-ups other than Pikett and the people he trained. Nicely's report will be admitted and considered commensurate with his experience.

Nicely watched the video of Pikett's line-up and reviewed Pikett's deposition. Nicely found that: (a) newer scents stand out as fresher amongst older scents; (b) scents from people who live in the same place smell similarly; (c) dogs can become accustomed to scents if they are exposed to them regularly; (d) Pikett's claim that his dogs are accurate ninety-nine percent of the time is unreliable; (e) Pikett may have influenced his dogs because he kept them on a short leash and could see in the cans; and (f) the dogs may have responded to deliberate cues from Pikett.

E.      *Insufficient Distractors.*

Pikett's filler scents were not useful distractors. Most of the scents were old, came from people who lived in the same place, and were stored in a location near the dogs.

Pikett kept the filler scents for as long as three years. The scents from the suspects were new. According to Nicely, newer scents stand out amongst older scents. The dogs may have alerted to Megan's scent because it was fresher than the others.

---

[15] Brown v. Miller, 519 F.3d at 237 (5th Cir. 2008).

Most of the filler scents came from the Fort Bend County Jail. According to Nicely, the filler scents that came from the Jail had a common institutional scent. The dogs may have alerted on Megan's scent because it stood out amongst the scents from the same place.

Pikett also stored the filler scents in a duffle bag in the back of his SUV. The dogs rode daily in the car next to the bag. According to Nicely, the dogs may have become accustomed to the filler scents because of prolonged exposure. The dogs may have alerted on Megan's scent because it was the only one they did not recognize.

Pikett testified at Megan's trial that his dogs have an accuracy rate between ninety-nine and one hundred percent. According to Pikett, he believes his dogs are wrong only when they "identif[y] the wrong person in the line-up."

Pikett cannot check his dogs' accuracy because no other test compares scents. It is more accurate to say that his dogs have only chosen a filler scent instead of a target scent twice out of a nearly a thousand line-ups. Nicely reports that a success rate of over ninety-nine percent is highly unlikely for scent identifying dogs.

Such a high success rate is an indication not that the dogs are accurate but that the filler scents are defective as distractors.

F.      *Pikett's Influence.*

Pikett's method may allow him to intentionally or subconsciously influence the outcome of the line-up. Pikett kept his dogs on a short leash and looked down while walking by each can. He used paint cans that did not have lids on them. He may have consciously or unconsciously influenced the result.

Pikett looked down while walking the line-up and did not ensure that the bags and gauze used for the suspects matched those used for his filler scents. Pikett may have been able to tell which can contained a suspect's scent by looking into the can. Also, when Pikett ran the second or third dogs, he knew which can the first dog had alerted on.

By keeping the dogs on a short leash, Pikett may have been able to cue the dogs to alert. According to Nicely, a dog may be cued intentionally or subconsciously. He also says that the dogs should have been trained to run the line-ups by themselves, with a different handler who did not train them, or at least given a longer leash with more slack to prevent cuing.

G.      *Dog's Alert.*

Pikett admits that he did not successfully train his dogs to alert in a specific way. Instead, he claims that he knows each dog's alert and can describe the alert before running the line-up. At Megan's trial, he said that anyone watching the line-up should be able to tell when the dog alerts but recently admitted that, as the handler, he is uniquely able to feel it.

According to Nicely, the video does not clearly show the dogs alerting on Megan's scent. It is also unclear whether Pikett cues the dogs or whether their reactions are caused by smelling the scents.

H.      *Pikett's Culpability.*

Megan has shown that the line-ups were likely to confirm the investigators' suspicions by linking the suspects' scents to the victim's scent. This could have happened due to ineffective filler scents, Pikett's subconscious acts, or Pikett's intentional acts. Though he may not have had a motive to harm Megan individually, his methods may have been designed to help officers confirm their suspicions.

Dogs help humans in a variety of difficult jobs. Dogs reliably guide the blind, flush game, comfort the ill, locate the lost, subdue the violent, interdict contraband, intimidate intruder, herd livestock, and track the fugitive.

While using a dog to alert among scents to connect a suspect to an artifact of the crime follows the pattern of these uses, Megan has introduced enough evidence to create a question about whether Pikett recklessly or intentionally designed a flawed test. Her claims against Pikett for fabricating evidence that was used to support her seizure, prosecution, and imprisonment survive.

13.     *Conclusion.*

Megan and Junior take nothing on their claims for illegal search against Johnson and Rogers because they sued after the limitations period.

The court can conclude as a matter of law that Rogers and Johnson are protected by qualified immunity for their arrests of Megan and Junior.

The county is not liable because Rogers is not liable.

No facts support the claims that Johnson and Rogers fabricated Campbell's testimony.

The court cannot decide as a matter of law whether Pikett's use of scent-pad line-ups to produce evidence against Megan was reckless. Megan's claim against Pikett survives.

Signed on October 4, 2016, at Houston, Texas.

_____
Lynn N. Hughes
United States District Judge

Appendix

| Johnson Affidavit | Corrected Affidavit |
|---|---|
| Junior and Megan visited Burr and asked to move in with him, but he said no. | Same. |
| A teacher saw an intimate exchange between Megan and Burr in which Megan asked Burr to spend some of the money he had hidden at his house on her. | Same. |
| A second teacher saw an angry exchange between Megan and Burr after which she muttered that someone should beat the shit out of him. | Same. |
| A third teacher said she was assaulted by Megan over a year before the murder. | Same. |
| The line-up established that Megan's and Junior's scents were on Burr's clothes. | Same. |
| A scent trail connected Burr's house to the Winfreys' house. | A scent trail connected Burr's house to the Winfreys house, though the scent used to trace the trail belonged to Chris Hammond, Megan's boyfriend. |
| Omitted. | Megan and Junior did not contribute to the blood at the scene and Megan's hair did not match hair found at the scene. |
| Campbell shared a prison cell with Senior who admitted to killing Burr. | Same. |
| Senior told Campbell that Megan and Junior let him in the back of the house. | In an initial interview, Campbell said that Megan and Junior let Senior in the back of the house. Campbell later said that Senior was accompanied by a cousin. |
| Campbell knew that Burr was in the living room when Burr was killed. | Campbell only revealed that he knew Burr was in the living room when he was killed in the second interview. |

| | |
|---|---|
| Campbell knew that Burr was badly beaten and that his neck was cut. | Though Campbell knew in both interviews that Burr was beaten and cut, in the second interview he said that Burr was also shot – a fact contradicted by the autopsy report. |
| Omitted. | Campbell thought that Senior cut off Burr's genitals and put them in Burr's mouth. |
| Senior told Campbell that he stole two guns from Burr's house. Burr's relative confirmed that two guns were missing from Burr's house after the murder – a shotgun and a .22 rifle. The investigators were not aware of the missing guns before Campbell's statements. | Senior told Campbell that he stole two guns from Burr – a pistol and a .3030 rifle. Burr's relative confirmed that two guns were missing from Burr's house after the murder – a shotgun and a .22 rifle. The investigators were not aware of the missing guns before Campbell's statement. Campbell did not mention the guns until the second interview. |
| Senior told Campbell that he hid the guns and a buck knife in a hollow on Winfrey property. | Senior told Campbell that he hid the guns and a knife in a hollow on Winfrey property. The investigators located an area that matched that description but did not find the guns or knife. |